IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

JULIAN A. RIGBY, Individually and
on Behalf of All Others Similarly
Situated,

    Plaintiff,

                              Case No. 7:05-CV-00122-HL

-vs-

FLUE-CURED TOBACCO COOPERATIVE         **JURY TRIAL DEMANDED**
STABILIZATION CORPORATION A/K/A
FLUE CURED TOBACCO COOPERATIVE

    Defendant.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND TO TRANSFER VENUE, OR IN THE ALTERNATIVE, CROSS MOTION TO TRANSFER VENUE

COMES NOW, JULIAN A. RIGBY, Plaintiff in the above referenced action, and files this his Response to Defendant's Motion to Dismiss and to Transfer Venue, or in the Alternative, Cross Motion to Transfer Venue, showing the Court as follows:

## INTRODUCTORY STATEMENT

Defendant Flu-Cured Tobacco Cooperative Stabilization Corporation (hereinafter "Stabilization") was created in June of 1946 for the purpose of implementing the Federal Tobacco Price Support program. While Stabilization is a North Carolina cooperative, its membership is comprised of tobacco farmers from the states of Florida, South Carolina, North Carolina, Virginia, and Georgia. (See "Company History," retrieved from Defendants web site, ustobaccofarmer.com, attached hereto as Exhibit A).

Unlike a typical cooperative, membership in Stabilization was mandatory during the pendency of the price support program.  In other words, whether an individual farmer marketed his tobacco through Stabilization or not, he was still required to be a member of Stabilization.  Initially, the obligation imposed by mandatory membership was payment of a $5.00 membership fee.  Over the course of the price support program, the obligation of mandatory membership changed to include payment of an assessment placed on every pound of tobacco sold by a farmer.  This assessment attached to all tobacco sold by a farmer, whether or not it was marketed and sold by Stabilization.

With the end of tobacco price support, Stabilization's primary purpose of administering the price support program has evaporated.  It is the termination of the purpose of the cooperative, and the stockholders equity accumulated due to the mandatory assessments paid by the farmers during the price support years, which prompt this litigation.  In addition to other remedies, the Plaintiff in this action seek distribution of the equity of Stabilization, and an accounting of his interest in the Defendant cooperative.

## **STATEMENT OF FACTS**

Arguing that this case has little or no connection to the Middle District of Georgia, or even to the State of Georgia, Defendant requests that this case be transferred to the United

States District Court for the Eastern District of North Carolina. As will be discussed below, the State of Georgia has strong ties to this case, including but not limited to, the following:

1. The No Net Fund Grower assessments were collected at the various auction warehouses in Georgia, deposited in Georgia bank accounts, and remitted to Stabilization (Gladys Griffin Affidavit, para 7);

2. Price Support was advanced to individual growers at the point of sale, the individual auction houses, from the accounts of the individual auction warehouses; (Rigby wrests, para. 15);

3. Stabilization Memberships were sold, and membership fees accepted, at the various auction warehouses (Rigby Affidavit, para. 15; Griffin Affidavit, para. 8; Griffis Affidavit, para. 5);

4. Stabilization members traveled to Georgia to collect these membership fees (Rigby Affidavit, para. 20; Griffin Affidavit, para. 9; Griffis Affidavit, para. 6);

5. Stabilization representatives traveled to Georgia to inspect warehouses prior to each auction season, and monitored the warehouses throughout the auction season (Rigby Affidavit, para. 19; Griffis Affidavit, para. 7);

6. Tobacco quota balances were calculated at the various auction warehouses, at the end of each auction day (Rigby Affidavit, para. 17);

7. The tobacco sold at Georgia warehouses was grown by Georgia Tobacco Farmers, on land located in Georgia;

8. By Stabilizations own estimations, at least 88,000 farmers in the State of Georgia alone whose interests are affected by this litigation;

9. Numerous Georgia tobacco farmers, have expressed an interest in this litigation (Rigby Affidavit, Exhibit para. 41).

These factors are relevant in evaluating the location of the evidence needed for Plaintiff to prove this case, and demonstrate

that the interests of justice will be served through litigation in a Georgia forum. Stabilization was built on the backs of these farmers, and their attempts to seek redress for their injuries should not be limited to a judicial forum where not one class member resides.

### A. The Plaintiff's Membership in and Support of Stabilization.

Since the early 1940's, federal price supports have been available to tobacco farmers. In July of 1982, the Tobacco Loan Program was dramatically changed with enactment of the "No Net Cost Tobacco Program Act of 1982," PL 97–218, 96 Stat. 197. As a practical matter, this act required tobacco farmers to pay an assessment per pound of tobacco sold. The purpose of the Act was to ensure that the tobacco price support program was to be "carried out at no net cost to the taxpayer," by requiring "producers of quota tobacco [to] share equitably in helping eliminate losses which may be incurred in carrying out the program." PL 97–218, 96 Stat. 197, Section 2 (July 20, 1982). Farmers, as producers of tobacco, "shared equitably" in the price support program by paying an assessment for every pound of tobacco sold. These "No Net Fund" contributions were collected by Stabilization, and maintained either in a separate fund held by Stabilization, or in an account with the Commodity Credit

Corporation.  See generally 7 U.S.C. § 1445-2 (1993), repealed, 118 Stat. 1523 (July 20, 2004).

As a practical matter, the role of Stabilization in administering the "No Net Fund" was carried out by the various auction warehouses throughout the tobacco belt.  Farmers brought their tobacco to auction in the various warehouses throughout the Southeast.  It is estimated that during the 1980's, there were between 35 and 38 such auction warehouses in Georgia and Florida. (Rigby Affidavit, para. 9).  Farmers were required to auction their tobacco at a warehouse within a hundred mile radius of their farm, see, e.g., 7 C.F.R. 1464.2(b)(2)(ii)(A)(2003),[1] thereby justifying the existence of numerous auction warehouses throughout the Southeast.  The business of Stabilization was conducted through these warehouses in the tobacco states, and was not limited to North Carolina.

The "No Net Fund" assessments were calculated and collected at the warehouses.[2]  Quota balances were recorded by the government agents in the warehouses based on information provided by the warehouses themselves.  Memberships were sold at the individual warehouses.  (See generally Rigby Affidavit, para. 13

---

[1]  This regulation provided, in part, that flue-cured tobacco be marketed at "any warehouse or warehouses in any market within a radius of 100 miles from the county seat of the county in which the farm is located . . ."

[2]  The role of the auction warehouses is fully discussed in the Affdaivits of Julian Rigby (filed under separate cover), and the Affdiavits of Gladys Griffin and Mikell Griffis attached hereto as Exhibits F and G respectively.

to 23; Griffin Affidavit, attached hereto as Exhibit F; and
Griffis Affidavit, attached hereto as Exhibit G).

Stabilization actively pursued its business in Georgia.
During the price support years, Stabilization would actively
monitor the warehouses, by coming in for annual inspections, or
receiving membership fees collected by the warehouses.  (Rigby
Aff. para. 19 and 20; Griffin Affidavit. para 8 and 9; Griffis
Affidavit, para. 6 and 7).  Before the end of price support,
Stabilization operated two marketing centers in Georgia, one in
Statesboro and one in Moultrie, Colquitt County, Middle District
of Georgia.  (A copy of the 2004 Annual Report is attached hereto
as Exhibit B).  Even at the time of filing this lawsuit,
Stabilization operated a marketing center in Nashville, Georgia
(part of the Middle District), which is where members would have
sold their tobacco had they been granted contracts.

Plaintiff Julian Rigby has been an active participant in this
process since the early 1970's.  He initially purchased his
Stabilization membership in the early 1970's, when he first sold
tobacco.  (Rigby Affidavit, para. 3).  Since that time, Rigby has
sold some tobacco through Defendant Stabilization every crop year
through 1999.  (Rigby Affidavit, para. 3).  Mr. Rigby has paid "No
Net Fund" assessments every year, ranging from .01 cents to .25
cents per pound of tobacco sold.  (Rigby Affidavit, para. 22).

Despite this consistent and mandatory interaction with Stabilization, Rigby never received a stock certificate evincing his initial membership.  He has never received any paperwork from Stabilization evincing his contributions to the "No Net Fund," or any communication from Stabilization indicating that his membership in this cooperative was terminated, until December of 2004.  (Rigby Affidavit, para. 33).

**B.  The Accumulated Wealth of Stabilization.**

Tobacco farmers such as Mr. Rigby had no choice but to pay assessments on every pound of tobacco they sold.  These assessments have inured to the benefit of Stabilization, and by 2004, Stabilization had amassed over $244,215,029.00 in stockholders equity.  (A copy of the Stabilization April 30, 2004 Consolidated Balance Sheet is included in its 2004 Annual Report, which is attached hereto as Exhibit B).  By Stabilization's own acknowledgment, $110 million of this stockholder's accrued equity flows from mandatory assessments paid for the 1982 to 1984 crop years, and another $102 million flows from mandatory assessments made between 1985 and 2005.  ("Flue Cured Tobacco SCOOP," Fourth Quarter 2005 at p. 3; a copy is attached hereto as Exhibit C; see also "Stipulation and Agreement of Class Action Settlement" at p. 2, filed in Lewis v. Flue-Cured Tobacco Stabilization Corporation, in the General Court of Justice, Superior Court Division, Wake County, North Carolina, Case No. 05-CVS-188, attached as Exhibit G

-7-

to Declaration of Arnold Hamm).  Plaintiff claims include his assertion that Stabilization has failed to accurately record his contributions to the "No Net Fund."  (Complaint, para. 14 through 16).

The end of the federal Price Support program in October of 2004 also marked the end of Stabilization's primary purpose.  With this end, Stabilization benefitted from the release of over 80 million pounds of tobacco formerly pledged as security for price support loans advanced by the Commodity Credit Corporation, meaning that this tobacco has now become an asset of Stabilization.  In addition, it appears that Stabilization has also benefitted from the elimination of its outstanding debt to the Commodity Credit Corporation.[3]  (A copy of pertinent portions of the Final Tobacco Reconciliation Document, dated November 16, 2005, is attached hereto as Exhibit D; the entirety of this document is available at the FSA official website, "www.fsa.usda.gov/tobacco/assets/facts.")

Some fo the issues to be addressed in this lawsuit include 1) whether Rigby and the other individual farmers have an interest in this accumulated wealth; 2) if so, what is the extent of this interest; and 3) whether this interest can be liquidated, through distribution of retained earnings to the farmers, or otherwise.

---

[3]  Disposal of loan tobacco held by Stabilization, and the transition from the price support program, are governed by Section 641 of the Fair and Equitable Tobacco Reform Act of 2005, PL 108-357.

**D.   Change of Purpose to the Detriment of Members.**

With price support gone, Stabilization has tried to recreate itself as a cigarette manufacturer.  Plaintiff believes that Stabilization has utilized retained earnings of the cooperative to purchase a cigarette manufacturing plant in Timberlake, North Carolina, during the summer months of 2004.  In theory, the tobacco needed to supply this manufacturing plant would come from the members of Stabilization.  However, Stabilization's commitment to support its members through purchase of their tobacco was selective, and only some members were granted supply contracts. (See Rigby Affidavit, para. 32.)  Other members who had historically supported Stabilization were denied the opportunity to take advantage of a sale outlet for their tobacco, despite the fact that this plant was purchased with assets of the cooperative. Stabilization did not honor Mr. Rigby's request to market tobacco through Stabilization for the 2004 crop year, and did not send him either an "exclusive sales contract" or a "non-exclusive sales contract" as he requested.  (Rigby Affidavit, para. 26 – 29). Other tobacco farmers who were members of Stabilization have reported the same situation to Mr. Rigby.  (Rigby Affidavit, para. 30).

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

**A.  The Motion to Dismiss Must be Denied.**

The first motion addresses the "contract" claims brought by the Plaintiff, based on Stabilization's offer to allow Mr. Rigby to contract to sell some of his tobacco for the 2005 crop season to Stabilization.  Mr. Rigby's indication that he would like to sell his tobacco through Stabilization was unrecognized and unacknowledged by Stabilization, and Stabilization never provided him with a contract, either exclusive or non exclusive.  (<u>See</u> Rigby Affidavit, para. 26 through 31).  Mr. Rigby's contract claim is based on the December 2004 letter to members, not on the unsigned versions of the Contract that Stabilization has placed in the record.  Stabilization has in fact denied that Mr. Rigby signed either an exclusive or non-exclusive marketing agreement, (Hamm Affidavit, para. 23).

As Defendant has noted, motions to dismiss alleging that a case has been brought in an improper forum based on a forum selection clause are typically deemed Motions to Dismiss for Improper Venue brought pursuant to Rule 12(b)(3).  <u>Lipcon v. Underwriters at Lloyd's</u>, 148 F.3d 1285, 1290 (11th Cir. 1998).  Under this rule, it is the Defendant, as movant, who bears the burden of demonstrating that the forum selection clause bars litigation of the contract claims in this court.  In the absence of a document signed by the Plaintiff containing a forum selection

clause, Defendant has not satisfied this burden, and the Motion must be denied.

**B.    This Case should be Litigated in the State of Georgia.**

Defendant next argues that this case should be transferred to the United States District Court for the Eastern District of North Carolina, primarily arguing that most of the witnesses and records are within that District.  In so moving, Defendant relies on 28 U.S.C. § 1404(a):

> **(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.**

28 USCS § 1404(a).  Resolution of this motion rests in the sound discretion of the trial court, and calls for evaluation of the relevant factors on an "individualized, case-by-case consideration of convenience and fairness."  <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988) (<u>quoting</u> <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 622 (1964)).  Included in these case-specific factors are "the convenience of the parties, the convenience of the witnesses, and the interest of justice."  <u>Pergo, Inc. v. Shaw Indus.</u>, 2003 U.S. Dist. LEXIS 26577 (D. Ga. 2003) (citing <u>Bell v. K-Mart Corp.</u>, 848 F. Supp. 996 (N.D. Ga. 1994)).

It is Stabilization, as the moving party, that bears the burden of demonstrating that the balance of Section 1404(a) interests weighs strongly in favor of the proposed transfer.

-11-

<u>Peridyne Technologly Solutions, LLC. v. Matheson Fast Freight,</u>
<u>Inc.</u>, 117 F. Supp. 2d 1366, 1373 (N.D. Ga. 2000).

### 1.    **Plaintiff's Choice of Forum is Entitled to Deference.**

"The federal courts traditionally have accorded a plaintiff's
choice of forum considerable deference." <u>In re Ricoh Corp.</u>, 870
F.2d 570, 573 (11th Cir. 1989); <u>see also</u> <u>Robinson v. Giarmaco &</u>
<u>Bill, P.C.</u>, 74 F.3d 253, 260 (11th Cir. 1996) ("The plaintiff's
choice of forum should not be disturbed unless it is clearly
outweighed by other considerations.").  Although there is
authority to support the proposition that this "deference is
significantly lessened in class action cases," <u>Hoffman v.</u>
<u>Medquist, Inc.</u>, --- F. Supp. ---, 2005 U.S. Dist. LEXIS 29995, *6
n.1 (N.D. Ga. Nov. 16, 2005), that fact that the putative class
does not include North Carolina residents should weigh in favor of
Rigby's choice of forum, and against transfer.

Plaintiff does not dispute that he could have brought this
case in North Carolina:  his "choice of forum" was to bring this
action in a state other than North Carolina.  The putative class
Plaintiff seeks to represent is composed of Stabilization members
from the states of Florida, Georgia, and South Carolina.[4]  It is
not surprising that a minority of the membership would look to a

---

[4]  The testimony presented by Stabilization suggests that 59% of
Stabilizations past and present shareholders and members reside in North
Carolina.  Hamm Declaration, para. 15.  This assertion has not been
tested by adverse discovery.

court other than Stabilization's "home state" for adjudication of their claims, especially when the allegations include claims that Stabilization decisions are guided by the interest of tobacco farmers in North Carolina to the detriment of the Class Members. This factor weighs in favor of, and not against, transfer of the case.

> **2.    There are a Substantial Number of Class Members in the Middle District of Georgia.**

Defendant attaches great weight to the fact that Plaintiff is a resident of the Southern District of Georgia, and not the Middle District.  Both the Southern and Middle districts of Georgia have strong ties to tobacco farmers.  The Middle District of Georgia is comprised of 70 different counties, including 21 that are typically referred to as "Tobacco Counties."[5]  Like the Plaintiff, these farmers did not have a choice as to whether they were to pay the mandatory assessment, which lead to the accumulation of the stockholder's equity.

As of 2003, there were at least 1158 tobacco growers in the Middle District of Georgia, and 875 tobacco growers in the

---

[5]  The Tobacco Counties in the Middle District of Georgia are:  Ben Hill, Berrien, Brooks, Clinch, Colquitt, Cook, Crisp, Decatur, Dooly, Dougherty, Echols, Grady, Irwin, Lanier, Lowndes, Mitchell, Terrell, Thomas, Tift, Wilcox, and Worth.

The Tobacco Counties for the Southern District of Georgia are: Appling, Atkinson, Atkinson, Bacon, Brantley, Bryan, Bulloch, Candler, Charlton, Coffee, Dodge, Emanuel, Evans, Jeff Davis, Jenkins, Johnson, Laurens, Liberty, Long, Montgomery, Pierce, Screven, Tatnall, Telfair, Treutlen, Ware, Ware, and Wheeler.

Southern District of Georgia.  (<u>See</u> Summary, attached hereto as Exhibit E; <u>see also</u> Rigby Affidavit, Exhibit F).[6]  If, as Stabilization contends, 11% of its past and present members and shareholders live in Georgia, then for the state of Georgia alone, the claims of at least 88,000 Georgia farmers are affected by this litigation.  This figure does not include the affected members in South Carolina and Florida.  The Middle District of Georgia clearly has important ties to the interest of the farmers, and to this litigation.

> ### 3.   Evidence that Stabilization is Giving Preference to Farmers in North Carolina is found in Georgia.

Mr. Rigby also represents farmers who wished to sell their tobacco to Stabilization at the end of price support years, but were denied the opportunity.  It is believed that North Carolina producers were favored in the awarding of these contracts.  (Rigby Affidavit, para. 26 to 28).

This suit is in part motivated by the fact that Stabilization, through its management and board decisions, has favored growers in North Carolina, and has allowed the management decisions pertaining to the cooperative to be dictated by the interest of those growers.  This perception is bolstered by the reality that only one member of the ten Stabilization directors is

---

[6]  The summary attached hereto as Exhibit E was prepared by Plaintiff's counsel, based on the information provided by Mr. Rigby.

from the state of Georgia, with six residing in North Carolina.
See Hamm Declaration at para. 16 through 19).

It is the interest of the hundreds of growers in Georgia,
South Carolina, and Florida which this suit seeks to protect.
Evidence pertaining to Stabilization's denial of class members'
requests to sell through Stabilization will be found with the
farmers themselves, and presented through their testimony.  None
of these farmers reside in North Carolina.

## 4.   The Convenience of the Parties and Witnesses.

"Section 1404 (a) provides for transfer to a more convenient
forum, not to a forum likely to prove equally convenient or
inconvenient." Van Dusen v. Barrack, 376 U.S. 612, 645-646
(1964).  In other words, the court should not simply shift the
convenience from one party to another, but should affirmatively
find that the North Carolina venue is, in reality, more convenient
to the parties and witnesses.  Scheidt v. Klein, 956 F.2d 963, 965
(10th Cir. 1992).[7]  Convenience of the parties is not established
by the mere number of witnesses.  Dupre v. Spanier Marine Corp.,
810 F. Supp. 823, 825 (D. Tex. 1993).

The convenience of the parties weighs in favor of keeping
this case in Georgia.  Because party witnesses include "the

---

[7]  The convenience of counsel is not a factor to be considered in
this balance.  Prather v. Raymond Construction Co., Inc., 570 F. Supp.
278, 285 (N.D. Ga. 1983).  Similarly, convenience of expert witnesses
should be afforded little weight.  Houston Trial Reports, Inc. v. LRP
Publ'ns, Inc., 85 F.Supp.2d 663, 669 (S.D. Tex. 1999).

parties themselves and those closely aligned with a party," they are presumed to be more willing to testify in a different forum. Ramsey v. Fox News Network, 323 F. Supp. 2d. 1352, 1356 (N.D. Ga. 2004) (quoting Gundle Lining Const. Corp. v. Fireman's Fund Ins. Co., 844 F. Supp. 1163, 1166 (S.D. Tex. 1994)).  Although Stabilization board members and officers primarily reside in North Carolina, not all fo them do.  Four of the eleven directors identified by Mr. Hamm in his declaration reside outside of North Carolina.[8]  Stabilization's active supervision of the warehouses during the price support years indicates both that travel outside of North Carolina for business purposes is both accepted and routine.  In other words, their claims of inconvenience are contradicted by the fact that they frequented this State in connection with the business of Stabilization.

In contrast, non-party witnesses are not "presumed" to be willing to travel to a different forum to testify.  Ramsey, 323 F. Supp. 2d. at 1356.  Many of the non-party witnesses identified by the Defendant reside in places other than North Carolina. Representatives of the various government agencies are located in Washington D.C.  And, for every farm advocacy group referenced by the Defendant as a potential witness, there are corresponding groups and witnesses in the State of Georgia, as well as

---

[8]  Director Kenneth Dasher resides in Florida, D. Lamar DeLoach resides in Georgia, Albert M. Johnson resides in South Carolina, and Andrew Sheppard resides in Virginia).  Hamm Declaration, para. 17(b).

representatives of the United States Department of Agriculture who work and reside within the State of Georgia.

Records of Stabilization membership will be located in the individual warehouses throughout the tobacco belt. Stabilization's claim that Mr. Rigby was not a member until 1982, and that he has not patronized Stabilization "since before the year 2000," (See Hamm Declaration, para. 24 and Answer, para. 2), underscores the need for evidence in addition to Stabilization's records.  In other words, evidence to contradict Stabilization's records of membership, patronage, and interest, will be located in the individual auction warehouses, with the individual farmers themselves, and with the FSA or Department of Agriculture.

> **5.   The Interests of Justice Favor Litigating the Action in the Middle District of Georgia.**

In evaluating whether the interests of justice weigh in favor of keeping the case in this forum, the Court is to be guided by "considerations of cost, judicial economy, expeditious discovery, and trial process."  Peridyne Technology Solutions, LLC. v. Matheson Fast Freight, Inc., 117 F. Supp. 2d. 1366, 1374-1375 (N.D. Ga. 2000).

The pendency of the other class actions in North Carolina does not weigh in favor of the transfer.  Although Stabilization notes that the Plaintiffs in the Lewis action have reached a "settlement that would resolve all claims of the putative class,"

-17-

(Stabilization Brief at 8), Defendant fails to note that the propriety of this settlement is the subject of a heated debate in the North Carolina court.  In fact, plaintiffs in the other class action, the <u>Fisher</u> case, have contested the fairness of this proposed settlement.  (A certified copy of the Affidavits submitted by Plaintiffs' counsel in the <u>Fisher</u> class, and opposing the Settlement of the <u>Lewis</u> class,  is attached hereto as Exhibit H).  The potential settlement does not necessarily bind the putative class members in this case, as they can always exercise their right to "opt-out."  As a practical reality, the potential settlement allows Stabilization to retain its accumulated wealth, requiring little actual distribution of cash to the farmers, based on information held by Stabilization.  (<u>See</u> Rigby Affidavit, para. 36 through 37, discussing the unfairness of the proposed settlement.)

The fact that "related" proceedings are pending in the State court system of the transferee court does not weigh in favor of transfer, because the federal and state cases cannot be consolidated.  Transfer of this case would not eliminate the possibility of inconsistent rulings or serve judicial economy. <u>See</u> <u>Hammond Corp. v. General Electric Credit Corp</u>., 374 F. Supp. 1356, 1360 (N.D. Ill. 1974).

Stabilization also argues that a federal court sitting in North Carolina will have more familiarity with the law applicable

to this case.  While the court's interpretation of North Carolina
law regarding cooperatives will certainly come into play, the
Plaintiff believes that interpretation of the federal statutes and
regulations regarding the "No Net Cost Fund" will also be of
primary concern to the Court.  Plaintiff's entitlement to these
funds (or the proceeds therefrom) may lie in the legislation
itself, and may not be found in the North Carolina cooperative
law.

> **E.   In the Alternative, this Case should be Transferred to
> the Southern District of Georgia.**

Should the Court determine that the Middle District is not a
"convenient" forum for this case, the Plaintiff requests that it
be transferred to the Southern District of Georgia, the district
within which he resides.  As discussed above, during the price
support years, the business of Stabilization was conducted in the
various auction warehouses throughout the state of Georgia.
Practically the same quality and quantity of evidence will be
available in the Southern District as in the Middle District.

<u>**CONCLUSION**</u>

For the forgoing reasons, the Plaintiff respectfully requests
that the Motion to Dismiss and to Transfer be **DENIED,** and that
this case be allowed to proceed through discovery and trial in
this judicial district.  In the alternative, the Plaintiffs

requests that this case be transferred to the Southern District of Georgia.

        **THIS THE <u>20TH</u> DAY OF <u>FEBRUARY</u>, 2006.**

                                SAVAGE, TURNER, PINSON & KARSMAN

                              BY:     <u>/s/ Brent J. Savage</u>
                                        Brent J. Savage
                                        Georgia Bar No. 627450

304 East Bay Street
Post Office Box 10600
Savannah, Georgia  31412
Phone:  (912) 231-1140
Fax: (912) 231-1140
E-mail: bsavage@savagelawfirm.net

BERGEN & BERGEN
Frederick S. Bergen
Georgia Bar No: 054160
123 E. Charlton St.
Savannah, GA 31401-4603
912-233-6600
Email: bergenlaws@aol.com

F. David McCrea
P.O. Box 412
412 West 15th Street
Alma, GA 31510
912-632-0030
Email: davidlaw@accessatc.net

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

JULIAN A. RIGBY, Individually
and on Behalf of All Others
Similarly Situated,

     Plaintiff,

                                 Case No. 7:05-CV-00122-HL

-vs-

FLUE-CURED TOBACCO COOPERATIVE       **JURY TRIAL DEMANDED**
STABILIZATION CORPORATION A/K/A
FLUE CURED TOBACCO COOPERATIVE

Defendant.

### INDEX OF EXHIBITS TO PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION TO DISMISS AND TO TRANSFER VENUE, AND CROSS MOTION TO TRANSFER VENUE

Exhibit A:        "Company History," retrieved from Defendants web site, ustobaccofarmer.com

Exhibit B:        Stabilization 2004 Annual Report, including Balance Sheet for 2004

Exhibit C:        "Flue Cured Tobacco SCOOP," Fourth Quarter 2005

Exhibit D:        Tobacco Reconciliation Document, dated November 16, 2005 (pertinent portions)

Exhibit E:        Summary of Tobacco Growers in Georgia, prepared by Plaintiff's Counsel

Exhibit F:        Affidavit of Gladys Griffin

Exhibit G:        Affidavit of Mikell David Griffis

Exhibit H:        Certified Copy of Affidavits filed in opposition to proposed Settlement of the Lewis Class, in Fisher v. Flue-Cured Tobacco Stabilization Corporation, In the Superior Court of Wake County, North Carolina, Civil Action No. 05 CVS 01938

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

JULIAN A. RIGBY, Individually and
on Behalf of All Others Similarly
Situated,

     Plaintiff,

                                        Case No. 7:05-CV-00122-HL

-vs-

FLUE-CURED TOBACCO COOPERATIVE
STABILIZATION CORPORATION A/K/A
FLUE CURED TOBACCO COOPERATIVE

     Defendant.

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on **FEBRUARY 20, 2006,** I electronically filed the foregoing **RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND TO TRANSFER VENUE, OR IN THE ALTERNATIVE, CROSS MOTION TO TRANSFER VENUE,** with the clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Gerald M. Edenfield
P.O. Box 1700
Statesboro, GA 30459
912-764-8600
Email: gerald@ecbcpc.com

Jackson Wyatt Moore, Jr.
2500 Wachovia Capitol Center
Raleigh, NC 27601
919-821-6688
Email: jmoore@smithlaw.com

James K. Dorsett, III
P. O. Box 2611
Raleigh, NC 27602-2611
919-821-1220
Email: jdorsett@smithlaw.com

Michael James Walker
115 Savannah Avenue
Statesboro, GA 30459
912-764-8600
Email: mjwalkerlaw@yahoo.com

**THIS THE <u>20TH</u> DAY OF FEBRUARY, 2006.**

SAVAGE, TURNER, PINSON & KARSMAN

BY: ____/s/ Brent J. Savage_____
Brent J. Savage
Georgia Bar No. 627450

304 East Bay Street
Post Office Box 10600
Savannah, Georgia  31412
Phone:  (912) 231-1140
Fax: (912) 231-1140
E-mail: bsavage@savagelawfirm.net